WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | No. CR-23-00223-001-PHX-DWL |
| Plaintiff, | **ORDER** |
| v. | |
| Jeffery Jessup, | |
| Defendant. | |

Pending before the Court is Defendant's motion to suppress "all the evidence obtained as a result of his unlawful arrest." (Doc. 52 at 1.) For the reasons that follow, the motion is denied.

## BACKGROUND

I. <u>Procedural History</u>

On October 28, 2024, Defendant filed the motion to suppress. (Doc. 52.)

On November 26, 2024, the government filed a response in opposition. (Doc. 58.)

On December 11, 2024, Defendant filed a reply. (Doc. 61.)

On January 13, 2025, the Court issued a tentative ruling. (Doc. 64.)

On January 22, 2025, the Court heard oral argument. (Doc. 66.) "Although the tentative ruling issued before oral argument stated that an evidentiary hearing was unnecessary because all of the material facts were undisputed, defense counsel identified two potential points of factual disagreement during oral argument: *first*, disputes concerning officers' observations of other individuals in the vicinity of the light rail station

around the time of Defendant's encounter with the police; and *second*, disputes concerning whether officers reasonably believed Defendant was armed." (Doc. 71.)

On February 4, 2025, the parties filed various factual stipulations regarding the first issue. (Doc. 68.) Those stipulations have been incorporated into the factual findings below.

On February 28, 2025, the evidentiary hearing regarding the second issue was scheduled to occur. (Doc. 78.) However, the hearing did not take place because Defendant engaged in disruptive behavior and had to be removed from the courtroom and defense counsel raised concerns over Defendant's competency. (*Id.*)

On March 3, 2025, defense counsel filed a formal written motion to determine Defendant's competency. (Doc. 79.) That motion was granted. (Doc. 80.)

On March 26, 2025, an examining psychologist issued a report concluding that Defendant is competent to stand trial. (Doc. 81 [sealed].)

On March 31, 2025, the Court held a competency hearing, during which the parties agreed to submit on the psychologist's report. (Doc. 84.) As a result, Defendant was found competent to stand trial. (*Id.*)

On May 2, 2025, the evidentiary hearing regarding the second issue took place. (Doc. 89.) At the outset of the hearing, the Court advised Defendant that if he chose to engage in disruptive behavior, he would be removed from the courtroom and the hearing would continue in his absence. Midway through the hearing, Defendant engaged in various forms of disruptive behavior. As a result, Defendant was removed pursuant to Rule 43(c)(1)(C) and the hearing continued in his absence.

On May 6, 2025, Defendant filed a supplemental brief. (Doc. 93.)

II.  Undisputed Facts Leading Up To The Encounter

Although the parties' motion papers reveal the existence of disagreements over certain facts related to Defendant's encounter with members of the Phoenix Police Department ("PPD") on the evening of February 8, 2023, the following facts are undisputed.

That evening, the PPD received a "priority one call" reporting that a juvenile victim had been robbed at gunpoint and carjacked at Coronado Park. (Doc. 58-1 at 2.) The caller—one victim's mother—described the perpetrator as "a black male in his twenties, 5'6", 120 pounds, wearing a maroon jacket, black jeans, and was armed with two handguns." (*Id.*)

At 9:29 pm, PPD Officer Zavala arrived at the home of one of the victims. (*Id.*) Officer Zavala learned that there were two juvenile victims, identified here as John Doe 1 and John Doe 2, and interviewed both of them. (*Id.* at 3.)

John Doe 1 explained that, at about 9:00 p.m., the perpetrator walked up to John Doe 2's car (which was parked in the parking lot of Coronado Park), told John Doe 2 to get out of the car, and then pointed handguns (one in each hand) at John Doe 1 and John Doe 2. (*Id.*) The perpetrator then told the victims to place their belongings in the car. (*Id.*) After they did so, the perpetrator fired one of the guns toward the victims but missed. (*Id.*) The victims then fled on foot while the perpetrator got into John Doe 2's car and drove off at a high rate of speed. (*Id.*) John Doe 2 gave a similar account of the encounter. (*Id.*)

When asked to identify the perpetrator, John Doe 1 stated that he was "a black male in his mid twenties," "approximately 5'7", 150 pounds, with spikey hair and an oily face," "wearing a puffy maroon jacket and black jeans," with "a black handgun in one hand and a black handgun with a silver barrel in the other hand." (*Id.*) John Doe 1 also stated that one of the "stolen items was a large hiking backpack" that contained, among other items, John Doe 1's iPhone. (*Id.*) Meanwhile, John Doe 2 "was only able to describe the suspect as a black male in his twenties" and reported that the perpetrator had taken "his red Jansport backpack" that contained, among other items, John Doe 2's iPhone. (*Id.*)

At approximately 9:45 p.m., as Officer Zavala was interviewing the victims, PPD Officer Horn arrived at Coronado Park to investigate. (*Id.* at 8.) Officer Horn located a witness who claimed that he "saw the whole incident happen." (*Id.*) This witness "believed the male in the driver seat [of the stolen vehicle] was a black male, possibly bald, wearing a red shirt or sweatshirt." (*Id.* at 8-9.)

At approximately 9:54 p.m., Officer Horn located John Doe 2's stolen vehicle in a parking lot near Coronado Park and determined it had been abandoned. (*Id.* at 9.) Officer Horn conveyed this information to Officer Zavala. (*Id.* at 3-4.)[1]

"Around the same time" (*id.* at 9)—*i.e.*, approximately 9:54 p.m.—Officer Zavala learned that John Doe 1's mother could track John Doe 1's stolen phone through the location-sharing function on her phone. (*Id.* at 4.) John Doe 1's mother provided Officer Zavala with "frequent updates" about the location of John Doe 1's phone, which showed that it was initially detected near 300 N. Central Avenue; that it was then "seen moving southbound towards Washington Street"; that it then pinged at various locations along Jefferson (1st Avenue and Jefferson, then 4th Street and Jefferson, then 9th Street and Jefferson, then 12th Street and Jefferson, then 20th Street and Jefferson, then 24th Street and Jefferson); and that it eventually "appeared to stay near the intersection of 24th Street and Jefferson and did not move from there." (*Id.*) Similarly, John Doe 2 stated that he could track his stolen phone through the locator function on his Apple watch, and he "found it to be pinging at 24th Street and Jefferson." (*Id.*)

Officer Zavala provided real-time updates to other PPD officers about the location of John Doe 1's stolen phone as it was moving and being tracked by John Doe 1's mother. (*Id.* at 9, 10.) These updates reflected that the stolen phone was moving in "the same [direction] as the eastbound lightrail train." (*Id.* at 10.)

At 10:10 p.m., Officer Zavala informed other officers (via the radio) that the last known location of the phones was 24th Street and Jefferson. (Doc. 52 at 4 [Defendant's acknowledgement of same].)[2]

At 10:10:20 p.m., the 105A train arrived at the platform of the light rail station at 24th Street and Jefferson. (Doc. 68 ¶ 4.) Three people entered the train: (1) a black male with a bicycle who was wearing black pants, a black top, and white shoes; (2) a white male

---

[1] Officer Horn also determined that "there was nothing of high value left inside of the vehicle either from the suspect or the victim[s]." (Doc. 58-1 at 9.)

[2] At 10:22 p.m., 10:31 p.m., and 10:34 p.m., Officer Zavala informed other officers (via the radio) that the phones had stopped moving and were located in the vicinity of 24th Street and Jefferson. (Doc. 52 at 4.)

1  wearing black pants, a blue jacket, a black beanie, and black sneakers; and (3) a male (race
2  unknown), possibly with a bag.  (*Id.* ¶¶ 1-4.)

3  Between 10:10:23 p.m. and 10:10:34 p.m., the following five passengers exited the
4  train and left the platform: (1) a young black male wearing grey sweatpants, a grey hoodie,
5  a black jacket, and black boots; (2) a heavy-set black male wearing all black; (3) a white
6  female wearing all black with a backpack; (4) a white female wearing jeans and a red jacket
7  with a backpack; and (5) a Hispanic female carrying a satchel and wearing black pants, a
8  grey shirt, and a white top.  (*Id.* ¶ 5.)

9  At 10:11:53 p.m., a male wearing blue jeans, a blue jacket, and a grey hoodie rode
10 his bicycle eastbound along the platform and entered the train.  (*Id.* ¶ 7.)

11 At 10:14:02 p.m., a Hispanic male wearing black pants, a jacket, a Diamondbacks
12 hat, and a backpack exited the train.  (*Id.* ¶ 8.)  This individual, whose initials are C.S.,
13 walked around the platform for a few minutes before walking westbound off camera view
14 facing east.  (*Id.* ¶¶ 8, 17.)

15 At 10:14:03 p.m., Officer Zavala informed other officers (via the radio) that "the
16 victims have their own clothing and jackets inside the vehicle, so the suspect could have
17 put their clothing on."  (Doc. 52 at 4 [Defendant's acknowledgement of same].)

18 At 10:16:30 p.m., a white male wearing black pants and a blue jacket—the same
19 individual who, as noted above, entered the train at 10:11:53 p.m.—stepped off the train,
20 looked around as if to see what was going on, and then walked back on the train at 10:16:42
21 p.m.  (Doc. 68 ¶ 9.)

22 At 10:17:03 p.m., a white or Hispanic male wearing black pants and a grey hoodie
23 walked off the train and walked around the platform.  (*Id.* ¶ 10.)  He got back on the train
24 at 10:18:37 p.m.  (*Id.*)

25 At 10:17:05 p.m., a white male wearing black pants and a blue jacket—the same
26 individual referenced two times above—stepped off the train and walked off the platform
27 while walking westbound.  (*Id.* ¶ 11.)

28 At 10:17:20 p.m., Defendant exited the train, walked around the platform, and then

1 walked east on the platform, going off camera at 10:18:10 p.m. (*Id.* ¶ 12.)

2 At approximately 10:18:20 p.m., law enforcement officials identified "[a]nother black male in a black jacket with a bicycle. Black hat. It's an Eagles hat. He just sat back down about the same spot [Defendant] got off." (*Id.* ¶ 13.)

At 10:20:44 p.m., an individual can be seen at the easternmost part of the platform. (*Id.* ¶ 15.) He appeared to be communicating with the conductor. (*Id.*) He then stepped away. (*Id.*)

At 10:21:45 p.m., C.S.—the Hispanic male who, as noted above, exited the train at 10:14:02 p.m.—threw his hands in the air in the middle of the platform, apparently upset that the train left. (*Id.* ¶ 16)

III. <u>The Encounter</u>

During the evidentiary hearing, the Court heard testimony from PPD Officer Figueroa-Salazar and PPD Officer Mead. (Doc. 90.) Their testimony was credible and the Court finds that it establishes the following additional facts.

At some point after 10:00 p.m., Officer Figueroa-Salazar arrived in the vicinity of the light rail station at 24th Street and Jefferson. Officer Figueroa-Salazar traveled to that location due to the phone-tracking information being relayed by other officers.

While conducting surveillance, Officer Figueroa-Salazar saw Defendant exit the train. As noted above, this occurred at 10:17 p.m. (Doc. 68 ¶ 12.) Defendant caught Officer Figueroa-Salazar's attention because he fit the physical and demographic description provided by the victims (other than his clothing).

Just before 10:23 p.m., Officer Figueroa-Salazar moved his police vehicle to a different location in the vicinity of the light rail station and turned on his body-worn camera ("BWC").[3] From this vantage point, Officer Figueroa-Salazar observed Defendant and

---

[3] Although defense counsel seemed to suggest during the evidentiary hearing that Officer Figueroa-Salazar could not have seen Defendant exit the train (which, per the parties' stipulation, occurred at 10:17 p.m.) because Officer Figueroa-Salazar did not arrive at the scene until 10:23 p.m. (as depicted in his BWC footage), Officer Figueroa-Salazar credibly testified that the he did not initially turn on his BWC and only turned it on after arriving at a later surveillance location.

- 6 -

C.S. speaking to each other. While speaking with C.S., Defendant repeatedly looked toward Officer Figueroa-Salazar in a suspicious manner that caught Officer Figueroa-Salazar's attention.[4]

At or around 10:24:35 p.m., Defendant walked toward Officer Figueroa-Salazar, who observed Defendant making furtive motions toward Defendant's waistband. During the evidentiary hearing, Officer Figueroa-Salazar credibly explained why, based on his training and experience, these movements caused him to believe Defendant was carrying a concealed firearm: "He was putting his hands in front of his waistband, kind of trying to hold something there, keep it from moving, which based on my training and experience . . . [is] a common trait where people keep weapons." A short time after making this observation, Officer Figueroa-Salazar announced on the police radio that "they" were "favoring their waistband." During the evidentiary hearing, Officer Figueroa-Salazar credibly explained that although he used the imprecise pronoun "they" when making this announcement, he only meant to convey his suspicion that Defendant was armed (and did not mean to imply that he also observed signs of C.S. being armed). The credibility of this testimony is bolstered by Officer Figueroa-Salazar's subsequent references to Defendant as the "primary" suspect and C.S. as the "secondary" suspect.

Officer Figueroa-Salazar credibly testified during the evidentiary hearing that he did not attempt to personally initiate an encounter with Defendant after making the observation regarding the suspected concealed firearm, in part because he was alone and believed that an encounter with an armed suspect without backup would be unsafe.

After Defendant and C.S. left the vicinity of the light rail station, they "split up." (Doc. 58-1 at 12.)

At 10:30:44 p.m., C.S. was arrested by PPD officers. (Doc. 68 ¶ 8.)

At approximately 10:33 p.m., officers observed Defendant walking north on 24th

---

[4] During the evidentiary hearing, Officer Figueroa-Salazar credibly explained that although he initially used phrases like "turning back" or "looking back" when describing how Defendant was looking at him, he did not mean to imply that Defendant had physically turned around to look at him—rather, he simply meant to describe how Defendant periodically stopped looking at C.S. in order to look at him.

- 7 -

Place from East Jefferson Street. (Doc. 52 at 5. *See also* Doc. 58-1 at 12 [same].) Defendant was wearing "a black beanie hat, a white, blue and yellow hooded sweater, charcoal grey sweatpants and white Nike tennis shoes." (Doc. 52 at 5.) Officer Mead then "confronted" Defendant, drew his firearm, activated the red and blue emergency lights on his police vehicle, and "order[ed]" Defendant "to prone himself out with his arms to his side." (Doc. 58-1 at 12.) Officer Mead was joined by other officers during this sequence—as described in Defendant's reply:

> [Defendant] was swarmed upon by approximately six police vehicles. He was approached by five law enforcement officers with their weapons drawn, wearing bulletproof vests and shields, all while being covered by other law enforcement officers with assault rifles and handguns all pointing at him while they secured themselves behind their vehicles. He was ordered to the ground and then directed to crawl to law enforcement officers. One PPD officer can be heard on camera yelling, "Hey, drop the bag! Drop the bag! Get on the ground! Do it now! Put your hands out to the side! Get on your belly! Put your hands out to the side! What you're going to do is crawl to me right now! Crawl! Keep crawling! Hey, keep crawling! Shut up! I don't want to hear a conversation! You keep crawling to me! Do it now, or I'm going to set my dog on you!" [Defendant] spent more than three minutes on the ground being yelled at and threatened before he was immediately placed in handcuffs by the approaching officers.

(Doc. 61 at 6-7.)

After being handcuffed, but before being frisked, Defendant admitted he had a gun in his waistband. (Doc. 58 at 3.) Officers subsequently found the gun in Defendant's waistband and found three additional guns in the red duffel bag. (*Id.*)[5]

## DISCUSSION

I. The Parties' Arguments

Defendant argues that the PPD officers lacked probable cause to believe he "was the suspect they were looking for" because (1) "the iPhone was not tracking [his] movements northbound on North 24th Place from East Washington" and instead was

---

[5] The Court notes that the discovery of a gun in Defendant's waistband provides further corroboration for Officer Figueroa-Salazar's earlier "favoring their waistband" observation.

"moving with light rail train No. 105A along the track"; (2) "[t]he iPhones were found on the platform at 24th Street and Jefferson stop," whereas he "was arrested two blocks north of the light rail stop at the corner of 24th Place and Adams Street"; (3) he "was not wearing a maroon jacket and black pants when he was arrested" and instead "was wearing a white, blue and yellow hooded sweater and charcoal grey sweatpants"; and (4) at most he fell within "the suspect pool [of] any 'black male in his twenties'" but "there were others that possibly fit that general description" in the vicinity, including "the black male wearing a black jacket with light grey pants" and other subjects described by one of the officers (one of whom "was arrested just minutes before the defendant"). (Doc. 52 at 8-9.)

The government offers two arguments in response. (Doc. 58.) First, the government argues that Defendant's encounter with the officers was not initially an arrest, but rather an investigatory stop pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968), and thus only needed to be supported by reasonable suspicion. (Doc. 58 at 8.) The government further argues that when officers found a gun in Defendant's waistband, this gave them "probable cause to arrest Defendant because he is a prohibited possessor." (*Id.*) Second, and alternatively, the government argues that even if the initial encounter was an arrest rather than a *Terry* stop, it was supported by probable cause because, among other things, "[t]he arresting officers were given a physical description of the suspect that was consistent with Defendant"; "Defendant was detained very close to where the [stolen] evidence was found only a few minutes after it arrived in that area"; and the officers "observed Defendant's suspicious movement of his waistband as if he had a weapon hidden there, and saw that Defendant had a large duffel bag that he could be using to carry stolen items." (*Id.* at 5-6.) The government also emphasizes that "upon contacting Defendant, officers were alerted that he had a firearm and found the key to the victim's vehicle." (*Id.* at 7.) Finally, the government argues that the locational and clothing differences identified by Defendant, as well as the presence in the vicinity of other black males in their 20s, do not negate the existence of probable cause. (*Id.* at 6-7.)

In reply, Defendant begins by disputing several of the factual assertions that appear

in the government's brief. For example, Defendant argues that he "was arrested, not detained, at the corner of 24th *Place* and Adams"—which is "two blocks *north* of where the phones were pinging and recovered"—and the arrest occurred "nearly twenty minutes" after Officer Zavala mentioned that the suspect could have put on other clothing. (Doc. 61 at 2.) Defendant also reiterates that several other black males were seen exiting the light rail train between 10:10 p.m. and 10:18 p.m. (*Id.* at 2-3.) In response to the government's assertion that the victims identified the red duffel bag found in his possession, Defendant argues that "[a]t no point did the victims describe owning the red Puma gym bag that [Defendant] was seen carrying." (*Id.* at 3-4.) In response to the government's assertion that he was moving in the same direction as the phones had been moving, Defendant argues that he was moving north at the time of his arrest while the phones (before they stopped moving) had been moving east. (*Id.* at 4-5.) In response to the government's assertion that the phones were found in a bush, Defendant argues that they were found on the light rail platform. (*Id.* at 5.) And in response to the government's assertion that the key to the victim's vehicle was found in his pocket, Defendant argues that they key was found on the light rail platform. (*Id.* at 6.) Defendant also argues that one of the facts emphasized by the government—that he was wearing two pairs of pants—is irrelevant in assessing probable cause existed because it was not discovered until after he was arrested. (*Id.*) Next, Defendant disputes the government's assertion that the encounter began as a *Terry* stop, arguing that he "was swarmed upon by approximately six police vehicles" and "was approached by five law enforcement officers with their weapons drawn, wearing bulletproof vests and shields, all while being covered by other law enforcement officers with assault rifles and handguns all pointing at him" and thus "was not free to ignore the police officer's orders and go about his business." (*Id.* at 6-9.) Finally, Defendant argues that there was not even reasonable suspicion to support a *Terry* stop because "[w]hen the court strips away all the misstatements about events that occurred, what is left is an arrest based on the defendant meeting the general description of a young black male. A description met by others in the area." (*Id.* at 9.)

- 10 -

II.     Analysis

The threshold issue raised by Defendant's suppression request is whether the encounter began as a *Terry* stop or an arrest. This distinction is potentially significant because, under *Terry*, "police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot, even if the officer lacks probable cause." *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (cleaned up). In contrast, "[t]o arrest an individual, police need more than a reasonable suspicion; they must have probable cause." *Barlow v. Ground*, 943 F.2d 1132, 1135 (9th Cir. 1991).

"There is no bright-line rule to determine when an investigatory stop becomes an arrest. Rather, in determining whether stops have turned into arrests, courts consider the totality of the circumstances. As might be expected, the ultimate decision in such cases is fact-specific." *Washington v. Lambert*, 98 F.3d 1181, 1185 (9th Cir. 1996) (cleaned up). "In looking at the totality of the circumstances, we consider both the intrusiveness of the stop, i.e., the aggressiveness of the police methods and how much the plaintiff's liberty was restricted, and the justification for the use of such tactics, i.e., whether the officer had sufficient basis to fear for his safety to warrant the intrusiveness of the action taken." *Id.* (citations omitted). "Under ordinary circumstances, when the police have only reasonable suspicion to make an investigatory stop, drawing weapons and using handcuffs and other restraints will . . . constitute an arrest." *Id.* at 1187. Courts "only allow[] the use of especially intrusive means of effecting a stop in special circumstances, such as 1) where the suspect is uncooperative or takes action at the scene that raises a reasonable possibility of danger or flight; 2) where the police have information that the suspect is currently armed; 3) where the stop closely follows a violent crime; and 4) where the police have information that a crime that may involve violence is about to occur. Clearly, some combination of these factors may also justify the use of aggressive police action without causing an investigatory stop to turn into an arrest." *Id.* at 1189 (citations omitted). "An additional factor courts consider in analyzing the reasonableness of the use of aggressive investigatory

- 11 -

tactics as part of a *Terry* stop is the number of police officers present." *Id.* at 1190.

Although the issue presents a close call, the Court concludes that, under the totality of the circumstances, the encounter between Defendant and the PPD officers began as a *Terry* stop. To be sure, the officers used especially intrusive means of effecting the stop—a group of officers pointed their guns at Defendant (who was alone), demanded that he lay prone on the ground before he had done anything to suggest uncooperativeness, and then handcuffed him without giving him the opportunity to speak. Such conduct nearly always transforms an encounter into an arrest. Nevertheless, the Ninth Circuit has recognized that, due to "[t]he complexity of [the] doctrinal scheme," "the identical police action can be an arrest under some circumstances and not in others" and thus "pointing a weapon at a suspect and handcuffing him, or ordering him to lie on the ground, or placing him in a police car will not *automatically* convert an investigatory stop into an arrest that requires probable cause." *Washington*, 98 F.3d at 1186.

Here, the officers had reason to suspect Defendant was armed—the guns identified by the victims were not found in John Doe 2's abandoned car, suggesting the perpetrator had taken the guns with him, and after Defendant left the light rail station, Officer Figueroa-Salazar observed him acting suspiciously and favoring his waistband area in a manner indicative of a concealed firearm. The officers also had reason to suspect that Defendant had just committed a violent crime in which he fired a gun at two juveniles before stealing their car. The Ninth Circuit has "permitted the use of intrusive means to effect a stop where the police have information that the suspect is currently armed or the stop closely follows a violent crime. Under such circumstances, holding a suspect at gunpoint, requiring him to go to his knees or lie down on the ground, and/or handcuffing him will not amount to an arrest." *United States v. Miles*, 247 F.3d 1009, 1013 (9th Cir. 2001).

That was the situation here, with one potential caveat. Had a single officer or perhaps two officers performed the stop of Defendant, the Court would have little trouble characterizing it as a *Terry* stop. *See, e.g.*, *United States v. Buffington*, 815 F.2d 1292, 1295, 1300-01 (9th Cir. 1987) (characterizing encounter as a *Terry* stop rather than an

arrest, even though "[p]olice officers . . . stopped the vehicle, ordered the appellants to exit the car at gunpoint, and forced them to lie face down on the pavement," because one of the suspects "was known to have a violent criminal history" and thus "a reasonable fear for their personal safety under these circumstances could justify policemen in using the precautions employed in this case"); *United States v. Taylor*, 716 F.2d 701, 708-09 (9th Cir. 1983) ("When the officers stopped Taylor and his apparent confederate, Pressler, to question them, we believe that the officers were justified in drawing their weapons in self-protection. The Supreme Court has recognized that the policeman making a reasonable investigatory stop should not be denied the opportunity to protect himself from attack by a hostile suspect. The purpose of a *Terry* stop is to allow the officer to pursue his investigation without fear of violence. Earlier on the day in question, Agent Dick and the other officers on the scene had attended a briefing where they had been told that Taylor was dangerous and were warned that others with Taylor should also be considered dangerous. . . . The handcuffing and frisk of Pressler for weapons was similarly justified. . . . Because there were two suspects and only two or three officers on the scene, Agent Dick deemed it prudent to have Pressler lie down and be handcuffed during the frisk."); *United States v. Jacobs*, 715 F.2d 1343, 1345-46 (9th Cir. 1983) ("The investigative stop did not become an arrest when the deputy pointed his gun at defendant and ordered her to 'prone out' . . . . The radio dispatch informed Deputy Boyett that the bank robber was possibly armed and under the influence of PCP, and Deputy Boyett was alone at the time. These circumstances justified the actions of Deputy Boyett in ordering defendant and her passenger to 'prone out' at gunpoint as a protective measure while he continued his investigation."); *United States v. Lopez*, 2011 WL 855808, *3 (N.D. Cal. 2011) ("Lopez was detained immediately after a serious shooting . . . at a location that dispatch had indicated was where the suspects were fleeing. Although it may be that Officers Fischer and Oliva did not have an exact description of the suspect outside the fact that the suspect was a Latin male, . . . the description did not rule out defendant Lopez as the shooter. The police had information that the suspect was armed and defendant Lopez was stopped

shortly after a violent crime. The instant facts are analogous to those in *Miles* . . . [so] the police's actions to effect and maintain control over the stop was warranted and a *de facto* arrest did not inure.").

The potential complicating factor here is that the stop was not performed by a single officer or two officers. Instead, Defendant was "approached by five law enforcement officers with their weapons drawn, wearing bulletproof vests and shields, all while being covered by other law enforcement officers with assault rifles and handguns all pointing at him while they secured themselves behind their vehicles." (Doc. 61 at 6-7.) Although the Ninth Circuit has recognized that it may be "prudent" for a single officer to "approach[] the suspects with his gun drawn" when the officer is "alone and outnumbered," the court has also suggested—albeit in a parenthetical summarizing an Eighth Circuit decision—that the "presence of seven squad cars" may be a "factor in determining that intrusive actions taken by police against two suspects in [a] car constituted an arrest." *Washington*, 98 F.3d at 1190 (citing *United States v. Thompson*, 906 F.2d 1292 (8th Cir. 1990)).

Although this parenthetical might suggest, at first blush, that the participation of multiple officers transformed Defendant's stop into an arrest, a closer review of *Thompson* reveals that, in that case, the two officers who initially stopped the defendant "evidently did not believe they needed to take any immediate action to protect themselves from the suspects because they took no such precaution when they stepped away from the suspects' vehicle to check their driver's licenses and car registration." 906 F.2d at 1297. Instead, it was only after this initial encounter—during which "neither suspect had made any movement that would indicate he might open fire on the officers"—and after "approximately seven squad cars" had arrived at the scene that the suspects were "taken from their vehicle" and "plac[ed] . . . in separate squad cars." *Id.* The Eighth Circuit held that the later step of placing the suspects into the separate squad cars "was not within the scope of a *Terry*-type stop." *Id.* This case is far different, as there was no initial encounter between Defendant and a smaller group of officers in which the officers displayed a lack of concern over their safety. To the contrary, Officer Figueroa-Salazar declined to initiate

1  an immediate encounter with Defendant after observing Defendant favoring his waistband
2  because Officer Figueroa-Salazar felt such a one-on-one encounter would be too risky. The
3  bottom line is that the officers who encountered Defendant after he walked away from the
4  light rail station had legitimate reasons to believe he was currently armed and had just
5  committed a dangerous crime in which he displayed a willingness to discharge his firearms.
6  It follows that it was reasonable for those officers to take steps—including pointing their
7  weapons at Defendant, ordering him to lay prone on the ground, and then handcuffing him
8  without giving him the opportunity to speak—to protect their own safety while performing
9  a *Terry* stop. *Taylor*, 716 F.2d at 708-09 ("[T]he policeman making a reasonable
10 investigatory stop should not be denied the opportunity to protect himself from attack by a
11 hostile suspect. The purpose of a *Terry* stop is to allow the officer to pursue his
12 investigation without fear of violence."). The Court cannot see how those same officer-
13 safety procedures could be characterized as unnecessary and unreasonable just because
14 there were multiple officers at the scene rather than one or two.

15    Of course, a *Terry* stop must still be supported by "reasonable suspicion," which
16 "exists when an officer is aware of specific, articulable facts which, when considered with
17 objective and reasonable inferences, form a basis for particularized suspicion." *United
18 States v. Tiong*, 224 F.3d 1136, 1139 (9th Cir. 2000). The Court concludes the officers
19 easily satisfied this threshold and in fact had probable cause to believe Defendant was the
20 person who had robbed and carjacked John Doe 1 and John Doe 2—which means
21 suppression would not be warranted even if, contrary to the analysis set forth above, the
22 encounter could be characterized as an arrest from inception.

23    "Probable cause exists when the police know reasonably trustworthy information
24 sufficient to warrant a prudent person in believing that the accused had committed or was
25 committing an offense." *United States v. Del Vizo*, 918 F.2d 821, 825 (9th Cir. 1990)
26 (cleaned up). "Probable cause is not a high bar." *District of Columbia v. Wesby*, 583 U.S.
27 48, 57 (2018) (cleaned up). "Because probable cause deals with probabilities and depends
28 on the totality of the circumstances, it is a fluid concept that is not readily, or even usefully,

1   reduced to a neat set of legal rules.  It requires only a probability or substantial chance of
2   criminal activity, not an actual showing of such activity." *Id.*

3   Although Defendant attempts to suggest otherwise in his motion papers, "the police
4   did not stop [him] solely because [his] racial appearance matched the racial description of
5   the robbery suspect." *United States v. Bautista*, 684 F.2d 1286, 1289 (9th Cir. 1982).  The
6   police not only had trustworthy information that the perpetrator was a black male in his
7   20s who met Defendant's general physical description, but also had trustworthy
8   information that the perpetrator was likely armed and had likely boarded the light rail at
9   some point after the robbery while carrying the victims' phones, traveled eastbound on the
10  light rail until reaching the station at 24th Street and Jefferson, and then exited the train
11  and dumped the phones in the vicinity of the station around or after 10:10 p.m.  The police
12  also had trustworthy information that the perpetrator had access to an additional set of
13  clothes—and, thus, it would not be unexpected for him to be dressed in different clothes
14  than those described by the victims.  The police then observed Defendant —a black male
15  in his 20s—arrive at the light rail station at 24th Street and Jefferson right around the time
16  the stolen phones arrived at that location and then stopped moving.  Additionally, after
17  Defendant got off the train and left the station, the police observed him acting suspiciously
18  with what appeared to be a concealed firearm in his waistband.  Under those circumstances,
19  a prudent person would have concluded there was a fair probability that Defendant was the
20  perpetrator.

21  As the government notes, *Gillis v. City & Cnty. of San Francisco*, 560 F. App'x 665
22  (9th Cir. 2014), supports the notion that probable cause existed under these circumstances.
23  In *Gillis*, the Ninth Circuit held that probable cause existed where "the police officers knew
24  an armed robbery had been committed by three African-American males wearing dark
25  clothing.  The officers knew the robbers were last seen running towards the Balboa BART
26  station.  Six minutes after the broadcast of the robbery, the officers observed three African-
27  American males in dark clothing sitting in a parked car a few blocks from the place of the
28  robbery and in the direction the suspects were last seen heading." *Id.* at 667.  Here,

similarly, Defendant met the physical and demographic description provided by the victims and was observed in close proximity to the light rail station at 24th Street and Jefferson reasonably close in time to when officers reasonably believed (based on the phone-tracking information) the suspect had exited that station. Of course, "[u]nder the law of this Circuit, mere resemblance to a general description is not enough to establish probable cause." *United States v. Lopez*, 482 F.3d 1067, 1073-74 (9th Cir. 2007). Thus, in *Gillis*, probable cause existed because the officers also had an additional piece of identifying information beyond demographic similarity and physical proximity—that the suspects were wearing clothing similar to that described by the victims. Here, although the clothing was not the same, the officers had an additional significant piece of identifying information beyond Defendant's physical and demographic characteristics and close proximity to the light rail station—they had reason to believe the perpetrator was armed and observed Defendant acting in a manner that suggested he was carrying a concealed firearm in his waistband. "[I]t is permissible to consider a general physical description where it is found in combination with other particularized bases for suspicion." *Lopez*, 482 F.3d at 1074.

The facts and factual disputes emphasized by Defendant do not compel a different conclusion. First, although Defendant's clothing was different than the clothing described by the victims, this difference was easily explained by Officer Zavala's announcement at 10:14 p.m.—almost 20 minutes before the encounter—that "the victims have their own clothing and jackets inside the vehicle, so the suspect could have put their clothing on." (Doc. 52 at 4.) Second, although Defendant emphasizes that he was walking in a northbound direction away from the light rail station at the time of the encounter, whereas the phones were observed moving in an eastbound direction, this directional analysis is a red herring. The Phoenix light rail runs eastbound from Central Avenue to 24th Street, which explains why the phones were traveling east until they arrived near 24th Street and Jefferson around 10:10 p.m., at which point they stopped moving. Based on this information, it was reasonable for the police to suspect the perpetrator had exited the light rail near 24th Street and Jefferson, dropped the phones, and was in the close vicinity of the

station on foot. That is exactly where the police encountered Defendant at 10:33 p.m. It is irrelevant that the encounter happened to occur two blocks north of the light rail station, as opposed to east (or west or south). Third, although Defendant notes that several other black males were also observed in the vicinity of the light rail station at 24th Street and Jefferson around the time he was observed, Defendant overlooks that none of those individuals was also observed engaging in conduct consistent with the concealment of a firearm in the waistband. Fourth, although Defendant contends that the decision to arrest C.S. (who did not meet the demographic description provided by the victims) shows that the police were conducting indiscriminate arrests of persons who happened to be in the vicinity of the light rail station, this overlooks that Officer Figueroa-Salazar reasonably came to view C.S. as a "secondary" suspect after observing C.S. speaking with Defendant outside the light rail station. Alternatively, even assuming the decision to arrest C.S. was improper, Defendant does not explain why improper police action directed toward a third party would undermine the police's separate decision, supported by probable cause, to initiate an encounter with him. Fifth, to the extent Defendant identifies certain other factual discrepancies and disputes (*e.g.*, whether the phones were found on the light rail platform or in a nearby bush; whether the key to John Doe 2's car was found on the light rail platform or in Defendant's pocket; whether the victims positively identified the red duffel bag before or after the encounter), it is unnecessary to resolve those discrepancies and disputes because they do not affect whether probable cause existed. *See, e.g.*, *United States v. Howell*, 231 F.3d 615, 621 (9th Cir. 2000) (concluding that "the magistrate judge did not abuse its discretion in refusing to hold an evidentiary hearing" where "[i]n his motion before the magistrate judge, Howell identified no facts which, if proved, would allow the court to suppress the confession"); *United States v. Harris*, 914 F.2d 927, 933 (7th Cir. 1990) ("A hearing will not be held on a defendant's pre-trial motion to suppress merely because a defendant wants one. Rather, the defendant must demonstrate that a significant, disputed factual issue exists such that a hearing is required.") (cleaned up).

…

Accordingly,

**IT IS ORDERED** that Defendant's motion to suppress (Doc. 52) is **denied**.

Dated this 12th day of May, 2025.

_____
Dominic W. Lanza
United States District Judge